**[J-59A-2022 and J-59B-2022] [MO: Donohue, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| THE BERT COMPANY D/B/A NORTHWEST INSURANCE SERVICES | : | No. 13 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered May 5, 2021 |
| v. | : | at No. 817 WDA 2019, affirming the |
| | : | Judgment of the Court of Common |
| | : | Pleas of Warren/Forest County |
| MATTHEW TURK, WILLIAM COLLINS, | : | entered June 3, 2019 at No. AD 260 |
| JAMIE HEYNES, DAVID MCDONNELL, | : | of 2017. |
| FIRST NATIONAL INSURANCE AGENCY, | : | |
| LLC, FIRST NATIONAL BANK, AND FNB | : | ARGUED: October 25, 2022 |
| CORPORATION | : | |
| | : | |
| | : | |
| APPEAL OF: MATTHEW TURK, FIRST | : | |
| NATIONAL INSURANCE AGENCY, LLC, | : | |
| FIRST NATIONAL BANK, AND FNB | : | |
| CORPORATION | : | |
| | : | |
| | : | |
| THE BERT COMPANY D/B/A | : | No. 14 WAP 2022 |
| NORTHWEST INSURANCE SERVICES | : | |
| | : | Appeal from the Order of the |
| | : | Superior Court entered May 5, 2021 |
| v. | : | at No. 975 WDA 2019, dismissing as |
| | : | moot the cross-appeal from the |
| | : | Judgment of the Court of Common |
| MATTHEW TURK, WILLIAM COLLINS, | : | Pleas of Warren/Forest County |
| JAMIE HEYNES, DAVID MCDONNELL, | : | entered June 3, 2019 at No. AD 260 |
| FIRST NATIONAL INSURANCE AGENCY, | : | of 2017. |
| LLC, FIRST NATIONAL BANK AND FNB | : | |
| CORPORATION | : | ARGUED: October 25, 2022 |
| | : | |
| | : | |
| MATTHEW TURK | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |

THE BERT COMPANY, NORTHWEST         :
BANK, AND NORTHWEST BANCSHARES,    :
INC.                                :
                                    :
                                    :
                                    :
APPEAL OF: MATTHEW TURK, FIRST      :
NATIONAL INSURANCE AGENCY, LLC,    :
FIRST NATIONAL BANK, AND FNB        :
CORPORATION                         :
                                    :
                                    :
                                    :

**CONCURRING OPINION**

**JUSTICE WECHT**                                    **DECIDED: JULY 19, 2023**

I join the Majority's excellent and thorough opinion in full. While I have significant doubts about much of the jurisprudence that controls the present inquiry and that assigns punitive damage awards a federal "constitutional status,"[1] the Majority has correctly and faithfully applied the standards (such as they are) set forth by the Supreme Court of the United States.[2]

I write separately because the current state of Supreme Court precedent forces courts to engage in analytical exercises that lack sufficient clarity. Future litigants would be wise to seek more useful guidance from the Court and perhaps a complete unshackling of punitive damage awards from the artificial constraints placed upon them by that Court's bewildering substantive due process jurisprudence.

The imposition and limitation of punitive damage awards traditionally were considered matters of state law concern, in deference to our common law heritage and

---

[1]    *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 12 (1991).

[2]    Hereinafter, unless otherwise specified, uses of "the Supreme Court" or "the Court" refer to the Supreme Court of the United States, rather than this Supreme Court or the highest courts of the other states.

to American principles of federalism.[3]  Nonetheless, and in derogation of this tradition, in recent decades the Supreme Court has declared that the Due Process Clause of the Fourteenth Amendment to the United States Constitution[4] places "procedural and substantive constitutional limitations on these awards" and "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."[5]  The analysis that courts are now required to conduct in order to detect the federal constitutional borderline—a line often and erroneously distilled as a 10:1 ratio rule[6] comparing punitive to compensatory damages—is riddled with caveats, qualifiers, and porous "guideposts" which render that analysis nearly incapable of principled application to concrete cases.  Moreover, the Supreme Court's jurisprudence has exposed in sharp relief the flaws and fault lines embedded in the underlying doctrine that itself brought punitive damages into the realm of federal constitutional adjudication:  the judicially-manufactured doctrine of "substantive due process."

---

[3]  *See, e.g.*, U.S. CONST. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").

[4]  U.S. CONST. amend. XIV, § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  The Fourteenth Amendment's Due Process Clause is distinct from the similar provision of the Fifth Amendment, a component of the original Bill of Rights applicable to the federal government.  U.S. CONST. amend. V ("[N]or shall any person . . . be deprived of life, liberty, or property, without due process of law . . . .").  In this opinion, references to the Due Process Clause refer to the Fourteenth Amendment, unless otherwise specified.  The case before us concerns only federal conceptions of due process and does not implicate any provision of the Pennsylvania Constitution.

[5]  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

[6]  This "rule," moniker, or shortcut traces to the Supreme Court's surmise in *State Farm* that, "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  *Id.* at 425.

Inasmuch as the substantive due process doctrine currently exists in a state of flux,[7] it is worthwhile to discuss that doctrine generally, to examine its theoretical alternatives, and to consider specifically how well the federal constitutional invalidation of a state punitive damage award, based merely upon its size, fits within the current paradigm. Can "excessive" punitive damages, awarded by a jury after an undisputedly fair trial in state court, deprive a civil defendant of property without federal due process of law?

**I.**

The United States Constitution protects unenumerated rights. The infirmity of the Supreme Court's precedent that governs the disposition of today's case, however, reinforces widely held doubts that the Due Process Clause—in its "substantive" guises— was ever the proper constitutional anchor for the identification of these rights. Two provisions of the United States Constitution stand out as far likelier guarantees of Americans' unenumerated rights: the Ninth Amendment[8] and the Privileges or Immunities Clause of the Fourteenth Amendment.[9] Both of these fundamental mandates provide straightforward and textual paths to the recognition and protection of unenumerated

---

[7]    *See Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228 (2022) (overruling *Roe v. Wade*, 410 U.S. 113 (1973); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)); *id.* at 2301 (Thomas, J., concurring) (calling for the reconsideration of all substantive due process precedents).

[8]    U.S. CONST. amend. IX ("The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.").

[9]    U.S. CONST. amend. XIV, § 1 ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ."). The Privileges or Immunities Clause of the Fourteenth Amendment is distinguishable from the Privileges *and* Immunities Clause of Article IV of the Constitution, which refers to the privileges and immunities of state rather than national citizenship. *See* U.S. CONST. art. IV, § 2 ("The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.").

rights. Oddly and maddeningly, both provisions have languished in obscurity within the pages of the Supreme Court's jurisprudence, while the Court has opted instead to venture further and further down the oxymoronic path of "substantive due process."[10]

If protection from "excessive" punitive damage awards in state courts is properly a matter of federal constitutional concern (and that is a very big "if"), the Supreme Court should provide an intellectually rigorous and disciplined justification for this protection as an unenumerated right grounded either in the Privileges or Immunities Clause or in the Ninth Amendment. Substantive due process is an inappropriate tool for federal oversight of state court punitive damage awards.

## A. Due Process of Law

The Fourteenth Amendment's Due Process Clause is expressed in simple terms: no state shall "deprive any person of life, liberty, or property, without due process of law." The natural reading of this provision (indeed, the only textual one) suggests that the protected rights, *i.e.*, life, liberty, and property, *may indeed be deprived* so long as the state provides the requisite "due process of law." This is an expressly procedural protection. It is a guarantee that the government must follow a fair *process* before the deprivation of any of the important rights identified.[11] This species of due process has come to be known by a facially redundant moniker: "procedural due process." It is from this core guarantee that we derive, for instance, the familiar requirements of notice and a

---

[10]    *See* Laurence H. Tribe, Saenz *Sans Prophecy: Does the Privileges or Immunities Revival Portend the Future—or Reveal the Structure of the Present?*, 113 HARV. L. REV. 110, 110 (1999) (hereinafter, "Tribe") (describing the fundamental rights jurisprudence of the twentieth century as "characterized by misguided efforts to ground such rights in the concept of due process").

[11]    Fundamental though these rights are, the government may deprive individuals of their lives (*e.g.*, the death penalty), their liberties (*e.g.*, the right to raise their children or even the right to vote), and their property (*e.g.*, a taking), so long as they are given fair process and the government does not violate some other constitutional command.

meaningful opportunity to be heard,[12] and the intuitive principle that legal controversies must be decided by a neutral adjudicator.[13] The demand for, and entitlement to, procedural fairness is a robust protection against arbitrary government action, and it stands as a pillar of our rule of law.[14] Whatever the extent and dimensions of the process that may be due under the circumstances of a particular case, it is this constitutional promise that provides the baseline assurance that Americans' rights will be safeguarded by fundamentally fair procedures.

Over time, this concern with procedural fairness evolved, developing into a view that certain governmental actions are intolerable regardless of the process employed.[15] The precise moment at which "substantive due process" crystallized as a distinct doctrine

---

[12]     *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) ("For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.'") (quoting *Baldwin v. Hale*, 68 U.S. 223, 233 (1863)); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.").

[13]     *See Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) ("[I]t certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.").

[14]     "The history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring).

[15]     *See generally* JOHN V. ORTH, DUE PROCESS OF LAW: A BRIEF HISTORY 33-72 (Univ. Press of Kansas 2003) (tracing the origin of substantive due process considerations to classically cited examples of procedural inequity mentioned in decisions such as *Calder v. Bull*, 3 U.S. 386, 388 (1798), such as a man serving as judge in his own case, or a hypothetical law that would take the property of 'A' and give it to 'B'); *id.* at 67 ("Although the A-to-B paradigm had once seemed only another example of procedural irregularity, it had in time acquired another meaning, substantive rather than procedural. In some cases property simply could not be taken, no matter by whom, no matter for what.").

is a matter of some debate.[16]  There is little dispute, however, that, by the time of *Mugler v. Kansas*[17] in 1887, the Supreme Court had embraced the notion that "due process of law" includes substantive limitations upon the sort of laws that may be enforced, independent of considerations of the laws' procedural fairness.[18]

Any discussion of "substantive due process" must clear the initial hurdle of its paradoxical framing.  The linguistic tension on the face of the doctrine has always been obvious.  As constitutional scholar John Hart Ely famously commented, the phrase is inherently contradictory, "sort of like 'green pastel redness.'"[19]  Judge Richard Posner has referred to the doctrine as a "ubiquitous oxymoron."[20]  Justice Antonin Scalia used the

---

[16]     Critics of the doctrine often contend that the first "substantive due process" decision was the infamous *Dred Scott v. Sandford*, 60 U.S. 393 (1857).  *See Casey*, 505 U.S. at 998 (1992) (Scalia, J., concurring in part) ("Both *Dred Scott* and one line of the cases resisting the New Deal rested upon the concept of 'substantive due process' that the Court praises and employs today.  Indeed, *Dred Scott* was 'very possibly the first application of substantive due process in the Supreme Court, the original precedent for *Lochner v. New York* and *Roe v. Wade*.'") (quoting D. CURRIE, THE CONSTITUTION IN THE SUPREME COURT 271 (1985)).  Although the core of the doctrine developed through the latter half of the nineteenth century, the first recorded instance of a United States Supreme Court Justice using the phrase "substantive due process" in an opinion was in 1948.  *See Republic Nat. Gas Co. v. Oklahoma*, 334 U.S. 62, 90 (1948) (Rutledge, J., dissenting) ("The basic question here is really one of substantive due process.").

[17]     123 U.S. 623 (1887).

[18]     *See Casey*, 505 U.S. at 846 ("Although a literal reading of the [Due Process] Clause might suggest that it governs only the procedures by which a State may deprive persons of liberty, for at least 105 years, since *Mugler v. Kansas*, 123 U.S. at 660-61, the Clause has been understood to contain a substantive component as well, one 'barring certain government actions regardless of the fairness of the procedures used to implement them.'") (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (citation modified).

[19]     JOHN HART ELY, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 18 (Harvard Univ. Press, 1980) ("[T]here is simply no avoiding the fact that the word that follows 'due' is 'process.' . . . Familiarity breeds inattention, and we apparently need periodic reminding that 'substantive due process' is a contradiction in terms—sort of like 'green pastel redness.'")

[20]     *Ellis v. Hamilton*, 669 F.2d 510, 512 (7th Cir. 1982).

same word.[21]  And Professor Akhil Amar has written that, because "the very phrase 'substantive due process' teeters on self-contradiction, it does not give us a sound starting point, or a directional push to proper legal analysis."[22]  Inasmuch as my more pedestrian imagination has always found the phrase perplexing, I take comfort in the knowledge that such giants of jurisprudence as these share my befuddlement.

Although questions of "substance" and "procedure" may at least arguably overlap at the margins,[23] my understanding is that "due process of law" is, and traditionally was understood as, predominantly a guarantee of procedural fairness.  As its substantive iterations have burgeoned into an immense body of precedent, the Due Process Clause has been forced to bear ever greater weight through the Supreme Court's uncritical application of the doctrine to vastly different areas of law.  It is astounding that, for instance, protection from a certain (or, as it happens, an uncertain) threshold of punitive damages is guaranteed by the same constitutional provision that, throughout its history, has been held to mandate that judges be neutral, to prohibit legislation regulating the weight of loaves of bread, and to secure the fundamental rights to marry or to rear one's children.  My primary difficulty with the doctrine is not the various approaches that the Court has taken to understanding unenumerated rights themselves, but rather the fact that it has never made sense to discover these rights within the ambit of due process when there are other plainly more intelligible constitutional sources.

---

[21]  *United States v. Carlton*, 512 U.S. 26, 39 (1994) (Scalia, J., concurring in the judgment) ("If I thought that 'substantive due process' were a constitutional right rather than an oxymoron . . . .").

[22]  Akhil Reed Amar, *Substance and Method in the Year 2000*, 28 PEPP. L. REV. 601, 631 (2001) (hereinafter, "Amar").

[23]  *See, e.g.*, *infra* nn.46-48 and accompanying text (discussing "arbitrary" and "vague" laws).

Of course, not all of the Supreme Court's substantive due process cases are created equal. The substantive strand of due process jurisprudence rose to prominence in the notorious "*Lochner* era,"[24] as the Court began to strike down laws intended to spur economic or social reform, ostensibly based upon those laws' perceived intrusion upon substantive rights like the "freedom of contract."[25] Although these efforts met resistance at the time from Justices such as Oliver Wendell Holmes, Jr., and Louis Brandeis,[26] for several decades the Court embarked on a project of judicial regulation of ordinary economic activity. It struck down a law that set maximum hours for working in bakeries.[27] It invalidated a statute that outlawed so-called "yellow dog" contracts which restricted labor union membership.[28] It rejected legislation that required minimum wages for women.[29] It overturned a measure that regulated the weight of loaves of bread.[30] Though the Court cast these decisions as protecting some substantive constitutional interest of employers and industrial producers, they came to be seen for what they were—

[24]  *See Lochner v. New York*, 198 U.S. 45 (1905) (overruled by *Ferguson v. Skrupa*, 372 U.S. 726 (1963)).

[25]  *See Allgeyer v. Louisiana*, 165 U.S. 578, 589 (1897).

[26]  *See Jay Burns Baking Co. v. Bryan*, 264 U.S. 504, 534 (1924) (Brandeis, J., dissenting) (opining that Court's invalidation of a law regulating the weight of loaves of bread was "an exercise of the powers of a super-Legislature—not the performance of the constitutional function of judicial review"); *Lochner*, 198 U.S. at 75 (Holmes, J., dissenting) ("[A] Constitution is not intended to embody a particular economic theory, whether of paternalism and the organic relation of the citizen to the state or of *laissez faire.*").

[27]  *Lochner*, 198 U.S. 45.

[28]  *Coppage v. Kansas*, 236 U.S. 1 (1915) (overruled by *Phelps Dodge Corp. v. N.L.R.B.*, 313 U.S. 177 (1941)).

[29]  *Adkins v. Children's Hosp. of the Dist. of Columbia*, 261 U.S. 525 (1923) (overruled by *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937)).

[30]  *Jay Burns Baking Co.*, 264 U.S. at 510-17 (abrogation recognized by *Ferguson*, 372 U.S. at 729).

deployment of the Due Process Clause to "strike down laws which were thought unreasonable, that is, unwise or incompatible with some particular economic or social philosophy."[31]  By the mid-1930s (and confronted with the ongoing reforms of the New Deal), the Court began its historic course-correction, returning to a constitutional attitude more deferential to the political branches of government, under which the judiciary declines to invalidate laws based upon a subjective assessment of their "wisdom, need, or appropriateness."[32, 33]

But some of *Lochner*'s vestiges remain with us.  While it purports to eschew the *Lochner* era's legacy, the Supreme Court has in subtle ways reverted to old habits.  As I explain below in Part II, the *Lochner* era cast a long shadow over what was to come.

Not all of the due process jurisprudence that flowed from the *Lochner* era shared its most reviled attributes, and much of that jurisprudence has survived.  Beyond the seemingly mercurial overriding of legislative judgments on ordinary economic matters, the Court also began to recognize certain personally held rights that it deemed fundamental, even though they are not enumerated in the Constitution.  Having

---

[31]     *Ferguson*, 372 U.S. at 729.

[32]     *Olsen v. Nebraska ex rel. W. Reference & Bond Ass'n*, 313 U.S. 236, 246 (1941) ("We are not concerned, however, with the wisdom, need, or appropriateness of the legislation."); *see also Ferguson*, 372 U.S. at 730 ("The doctrine that prevailed in *Lochner*, *Coppage*, *Adkins*, *Burns*, and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely—has long since been discarded.  We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws.").

[33]     Oddly, notwithstanding the Supreme Court's long-ago-abandonment of *Lochner*, this Court has persisted in *Lochner*-izing under its own vague notions of federal and/or state due process.  *See Ladd v. Real Est. Comm'n*, 230 A.3d 1096, 1116-20 (Pa. 2020) (Wecht, J., dissenting); *Shoul v. Commonwealth, Dep't of Transportation, Bureau of Driver Licensing*, 173 A.3d 669, 688-94 (Pa. 2017) (Wecht, J., concurring).

essentially foresworn the Privileges or Immunities Clause,[34] and having persisted in neglecting the Ninth Amendment, the Supreme Court turned instead to the Due Process Clause.  In *Meyer v. Nebraska*[35] and *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*,[36] for instance, the Supreme Court struck down laws prohibiting, respectively, teaching foreign languages in schools and sending children to private religious schools.  These laws offended, as the Court saw it, the due process interest of "the liberty of parents and guardians to direct the upbringing and education of children under their control."[37]  It is notable, as discussed below, that, at the time of these decisions, the guarantees of the Bill of Rights had not yet been deemed fully applicable to the states, and it is conceivable that the Court in early "fundamental rights" cases looked to the Fourteenth Amendment's Due Process Clause as an alternative to, for instance, the First Amendment, which at the time provided no protection against the actions of state governments.[38]  Indeed, the very use of the Fourteenth Amendment's Due Process Clause as the vehicle for "incorporation" of the Bill of Rights against the states represents a significant strand of substantive due process jurisprudence that ran

---

[34]     *See Slaughter-House Cases*, 83 U.S. 36 (1872).

[35]     262 U.S. 390 (1923).

[36]     268 U.S. 510 (1925).

[37]     *Id.* at 534-35.

[38]     *See* Erwin Chemerinsky*, Substantive Due Process*, 15 TOURO L. REV. 1501, 1505-06 (1999) (positing that *Meyer* and *Pierce* relied upon substantive due process because First Amendment protections were not yet incorporated against state governments).  Of course, as discussed below, this does not explain the Court's failure to notice the Clause adjacent to the Due Process Clause—the Privileges or Immunities Clause.

parallel to the *Lochner* era, and it continues to undergird much of American constitutional law to this day.[39]

The Supreme Court's retreat from *Lochner* was not a wholesale repudiation of all judicial review of the substantive content of laws. In *West Coast Hotel Co. v. Parrish*, the Court disavowed the erratic and unprincipled approach to economic due process that characterized the *Lochner* era,[40] but it left some room for judicial consideration of a law's substance. The Court explained: "Liberty under the Constitution is thus necessarily subject to the restraints of due process, and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process."[41] The Supreme Court developed this principle into what would become the familiar "rational basis" standard of review.[42] In *United States v. Carolene Products Co.*, the Court explained that "regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally

---

[39] *See, e.g.*, *McDonald v. City of Chicago*, 561 U.S. 742 (2010) (holding that the Second Amendment to the United States Constitution is applicable to the states via the Due Process Clause of the Fourteenth Amendment); *id.* at 754-67 (discussing the history of incorporation under the Due Process Clause); *id.* at 861 (Stevens, J., dissenting) ("This is a substantive due process case."). As discussed below in Part I(C), the Privileges or Immunities Clause was (and is) better suited to this incorporation task.

[40] *West Coast Hotel Co.*, 300 U.S. at 391 ("In each case the violation alleged by those attacking minimum wage regulation for women is deprivation of freedom of contract. What is this freedom? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law. In prohibiting that deprivation, the Constitution does not recognize an absolute and uncontrollable liberty. Liberty in each of its phases has its history and connotation. But the liberty safeguarded is liberty in a social organization which requires the protection of law against the evils which menace the health, safety, morals, and welfare of the people.").

[41] *Id.*

[42] *See, e.g.*, *Nebbia v. People of New York*, 291 U.S. 502, 525 (1934); *Washington v. Glucksberg*, 521 U.S. 702, 728 (1997) (assessing whether prohibition of physician-assisted suicide, deemed not to be a fundamental right, is "rationally related to legitimate government interests").

assumed it is of such a character as to preclude the assumption that it rests upon some rational basis within the knowledge and experience of the legislators."[43]  Thus, even though the era had passed in which the Court would employ the Due Process Clause as a cudgel to strike down disfavored laws, that Clause continued to serve as a protection against "arbitrary" or "irrational" laws.[44]

The Due Process Clause similarly has been held to provide protection against "vague" laws.  In this strand of due process jurisprudence, which likewise gathered momentum during the *Lochner* era,[45] the Court has held that laws may violate due process "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."[46]  The requirement of "fair notice"—a concept so

---

[43]  *United States v. Carolene Products Co.*, 304 U.S. 144, 152 (1938).  It is immediately following this "rational basis" statement that the *Carolene Products* Court placed its famous Footnote Four, which forecast the development and application of what would become strict scrutiny—a "more searching judicial inquiry"—to laws that restrict fundamental rights or reflect prejudice against "discrete and insular minorities."  *Id.* at 152 n.4.

[44]  *See* Peter J. Rubin, *Square Pegs and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights*, 103 COLUM. L. REV. 833, 844 (2003) ("Governmental conduct that does not trench [*sic*] on any fundamental right is also subject to invalidation as a matter of substantive due process . . . .  The ordinary formulation is that such governmental action must be 'rationally related to a legitimate governmental purpose,' or that it may not be 'arbitrary' or 'irrational,' or 'arbitrary and irrational,' or 'fundamentally unfair or unjust,' or 'purposeless.'") (footnotes omitted) (citing, *inter alia*, *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 84 (1978); *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 650 (1974)).

[45]  *See Johnson v. United States*, 576 U.S. 591, 618 (2015) (Thomas, J., concurring) (identifying the first decision in which the Supreme Court invalidated a law on vagueness grounds as *International Harvester Co. of America v. Kentucky*, 234 U.S. 216 (1914), in the heart of the *Lochner* era).

[46]  *Johnson*, 576 U.S. at 595 (citing *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)).

important in the law of *procedural* due process—in this context serves the need to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."[47]

The prohibitions of "arbitrary" and "vague" laws are due process concepts that work their way into the precedents that govern punitive damages, as discussed below in Part II. These considerations are in some sense substantive, inasmuch as they are concerned with the content of laws and the objects that those laws seek to attain. But these branches of due process jurisprudence are less conceptually challenging than some due process strains because they do not purport to define substantive rights. Because "[l]iberty implies the absence of arbitrary restraint,"[48] there is room within the doctrine for minimal inquiry into a law's means and ends, if only to satisfy the "baseline requirement of 'rationality.'"[49] Moreover, at least in some circumstances, these protections may have a conceivable connection to procedural concerns. Many laws that are "arbitrary" or "irrational" may be seen in some sense as failures of procedure, perhaps because they offer no process to prevent unjustified deprivations or no process to weigh the reasons for the government's actions.[50] And, as noted above, the void-for-vagueness doctrine's concern for "fair notice"

---

[47] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[48] *West Coast Hotel Co.*, 300 U.S. at 392.

[49] John Hart Ely, *The Wages of Crying Wolf: A Comment on* Roe v. Wade, 82 YALE L.J. 920, 928 (1973).

[50] Indeed, the Court has described "arbitrariness" in such terms. *See Daniels*, 474 U.S. at 331 (the history of due process "reflects the traditional and common-sense notion that the Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the *arbitrary* exercise of the powers of government. By requiring the government to follow *appropriate procedures* when its agents decide to 'deprive any person of life, liberty, or property,' the Due Process Clause promotes fairness in such decisions.") (emphasis added; internal citations and quotation marks omitted).

of prohibited conduct is a principle directly tethered to procedural due process.[51] These species of protections further differ from other "substantive" due process rights in precisely *what* they protect. To say that a law is "arbitrary," "irrational," or "vague," is not to say that its subject is problematic or otherwise off-limits. The problem lies in the way the law exists as drafted.

In the realm of unenumerated fundamental rights—the last stop on our brief tour of due process—how the law is written is of less consequence, and questions of procedure are eclipsed by substantive focus upon the importance of the right itself.[52] Since the latter part of the twentieth century, the Supreme Court has recognized several of these deeply personal rights. The rights at issue lie at the heart of personal autonomy, private decision-making, and human dignity, and are deemed fundamental to individual liberty, although not specifically listed in the Constitution. The conceptual anchor that the Court chose to use for these unenumerated rights was a strand of constitutional theory that either sounded directly in due process[53] or was derived from an implied right of privacy, which, in time, came to be understood as a component of the "liberty" protected by the Due Process Clause.[54] Subsequent decisions in this realm grew to recognize

---

[51] *See supra* n.12; *Mullane*, 339 U.S. at 314.

[52] Where a law concerns a restriction on rights deemed to be "fundamental," the Supreme Court generally applies strict scrutiny, rather than the above-referenced rational basis test. *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 302 (1993) (substantive due process "forbids the government to infringe certain 'fundamental' liberty interests . . . no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (citing, *inter alia*, *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *United States v. Salerno*, 481 U.S. 739, 746 (1987)).

[53] *See supra* n.38; *Meyer*, 262 U.S. 390; *Pierce*, 268 U.S. 510.

[54] The Court's decision in *Griswold v. Connecticut*, 381 U.S. 479 (1965), which recognized a right of married persons to use contraceptives, expressly avoided substantive due process, seeking to sidestep the legacy of *Lochner*. *See id.* at 481-82 ("Overtones of some arguments suggest that *Lochner v. New York* should be our guide. (continued…)

numerous rights that the government was seen as having limited authority to restrict, such as the right to marry,[55] the right to use contraceptives,[56] the right to consensual sexual

But we decline that invitation . . . .") (citation omitted).  *Griswold* instead found the right to "privacy" within the "penumbras" of various provisions of the Bill of Rights, including the First, Third, Fourth, Fifth, and Ninth Amendments.  *See id.* at 484 ("The foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance.").  Over time, however, the right to privacy came to be understood as a liberty interest protected by substantive due process.  *See, e.g.*, *Carey v. Population Services, Intern.*, 431 U.S. 678, 684 (1977) ("Although '(t)he Constitution does not explicitly mention any right of privacy,' the Court has recognized that one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'") (quoting *Roe v. Wade*, 410 U.S. 113, 152 (1973)).

[55]     *Loving v. Virginia*, 388 U.S. 1, 12 (1967) (invalidating law prohibiting interracial marriage) ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Turner v. Safley*, 482 U.S. 78 (1987) (invalidating law denying prison inmates the right to marry); *Obergefell v. Hodges*, 576 U.S. 644 (2015) (invalidating law denying same-sex couples the right to marry).

[56]     *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) (invalidating law prohibiting the distribution of contraception) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Carey*, 431 U.S. 678 (invalidating law prohibiting distribution of contraceptives to minors); *Griswold*, 381 U.S. 479 (1965) (invalidating law prohibiting use of contraceptives as applied to married persons).

activity,[57] the right to raise one's children as one wishes,[58] the right to refuse medical care,[59] and the right to decide whether to terminate a pregnancy.[60]

My difficulty with the Court's due process precedent has nothing to do with the recognition of these fundamental rights. In general, I find these cases persuasive in establishing that such interests fall into the category of "none of the government's damn business," and are sufficiently fundamental to the "realm of personal liberty" to warrant constitutional protection.[61] The problem is the stubborn insistence on cramming these

---

[57]     *Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (invalidating law prohibiting same-sex sexual activity) ("The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.").

[58]     *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (invalidating law allowing any person to petition for visitation rights with children) ("The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Pierce*, 268 U.S. 510 (invalidating law prohibiting private parochial schooling); *Meyer*, 262 U.S. 390 (invalidating law prohibiting the teaching of foreign languages in schools).

[59]     *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 281 (1990) (recognizing a right to refuse life-sustaining medical care) ("The choice between life and death is a deeply personal decision of obvious and overwhelming finality. . . . It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."); *Washington v. Harper*, 494 U.S. 210 (1990) (recognizing a prison inmate's interest in refusing administration of antipsychotic drugs, but finding the state's interest satisfactory to justify the compelled administration).

[60]     *Roe*, 410 U.S. at 153 (invalidating law prohibiting abortion) ("This right of privacy, whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy."); *Casey*, 505 U.S. 833 (reaffirming the "essential holding" of *Roe*). *Roe* and *Casey* were both overruled by *Dobbs*, 142 S.Ct. 2228.

[61]     "It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter." *Casey*, 505 U.S. at 847 (overruled by *Dobbs*, 142 S.Ct. 2228).

natural rights into the ramshackle dwelling of "substantive due process."  None of the Supreme Court's precedents meaningfully reconciled the "substance" and the "process," or even acknowledged that "substantive due process" reflects a contradiction in terms and a clash of conflicting principles.  I am unable to comprehend how the quintessentially procedural right to "due process of law" manages to house all of the "substantive" guarantees attributed to it, alongside its intuitive "procedural" protections, coupled with a protection from arbitrary, irrational, or vague laws, all while separately serving as the Court's chosen vehicle for the Fourteenth Amendment's incorporation of (most of)[62] the Bill of Rights against the States.  More to the point here, as I discuss below in Part II, because the Court's current explication of the federal constitutional oversight of punitive damages blends attributes of these various categories of due process, I struggle to make sense of it within the broader framework.  The problem may be that the breadth of this jurisprudence has stretched the Due Process Clause well beyond what its text can plausibly support.

That said, the Supreme Court's attitude toward the requirements of "due process of law" clearly is not immutable.  I suspect that due process has continued to wear its substantive hat for this long primarily out of fidelity to precedent and regard for public reliance upon that precedent.  But the hat is threadbare.  *Stare decisis* notwithstanding, the Court has never shied away from periodic alterations to the doctrine, from reconceptions of the nature of unenumerated rights,[63] to the seismic shift represented by

---

[62]    Several provisions of the Bill of Rights have not been incorporated against the states: the Third Amendment, the Seventh Amendment, the Fifth Amendment's right to indictment by grand jury, and the Sixth Amendment's right to a jury selected from the state and district in which the crime occurred.  *See* U.S. CONST. amend. III, V, VI, VII.

[63]    *See, e.g.*, *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting) (stating that "the full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution," but rather consists of "a rational continuum which, broadly speaking, (continued…)

the demise of the *Lochner* era, to *Dobbs*.[64]   None of the Supreme Court's pronouncements were (or are) received at Mount Sinai on stone tablets.  The Supreme Court recently has demonstrated its willingness to reconsider longstanding precedent in the realm of substantive due process.  As the Court says, "*stare decisis* is not a straitjacket."[65]

For the sake of the future of American civil rights, the time has come for advocates to develop and advance arguments—even in the alternative—that substantive, yet unenumerated, protections emanate not from the Due Process Clause, but rather from what was always their proper home in the Ninth Amendment, the Privileges or Immunities Clause, or both.

**B. The Ninth Amendment**

The most obvious constitutional source for the recognition of unenumerated rights is the provision that expressly refers to their existence.  Its language is straightforward. Immediately following the specific enumeration of particular rights in the first eight Amendments to the Constitution, the Ninth provides:

---

includes a freedom from all substantial arbitrary impositions and purposeless restraints"). Justice Harlan's dissent in *Poe* was favorably cited in *Griswold*, 381 U.S. at 484, and *Casey* relied heavily upon it.  *Casey*, 505 U.S. at 848-89.  The Court rejected Justice Harlan's broader framing in favor of a greater focus upon historical analysis in *Glucksberg*, holding that substantive due process "specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'"  *Glucksberg*, 521 U.S. at 720-21 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality); *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934); *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)); *see also Dobbs*, 142 S.Ct. at 2242 (quoting *Glucksberg*, 521 U.S. at 721).

64      *Dobbs*, 142 S.Ct. 2228 (overruling *Roe* and *Casey*).

65      *Id.* at 2280.

> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.[66]

Thumbing through the pages of the United States Reporter, however, one could be forgiven for failing to notice that the Ninth Amendment even exists. Effectively ignored by the Supreme Court for generations, the Ninth Amendment has long served more as fodder for scholars than as any meaningful mandate.

Although the meaning of this provision has engendered debate,[67] the reason for its existence is well-documented. At the nation's founding, the "Anti-Federalists" advocated for the inclusion of a Bill of Rights within the Constitution, along the lines of the Declarations of Rights found in numerous state constitutions, such as Pennsylvania's. Opponents of this idea, the "Federalists," feared that no document could comprehensively list all fundamental rights,[68] and that enumerating some might imply that the federal

---

[66]   U.S. CONST. amend. IX.

[67]   *See* Randy E. Barnett, *The Ninth Amendment: It Means What It Says*, 85 TEX. L. REV. 1, 3, 11-21 (2006) (hereinafter, "Barnett") (discussing different approaches to the Ninth Amendment that have emerged among scholars, all of which purport to carry the banner of "originalism"). Assembling the historical evidence, Professor Barnett concludes that the Ninth Amendment guarantees protection of "individual, natural, preexisting rights" that were not enumerated, and that its purpose was to "ensure that all individual natural rights had the same stature and force after some of them were enumerated as they had before." *Id.* at 13, 2. "In other words, it means what it says." *Id.* at 80. I share Professor Barnett's view.

[68]   James Wilson, a delegate to both the Constitutional Convention and the Pennsylvania ratifying convention, gave a speech at the time in which he stated:

> All the political writers, from Grotius and Puffendorf down to Vattel, have treated on this subject; but in no one of those books, nor in the aggregate of them all, can you find a complete enumeration of rights appertaining to the people as men and as citizens. . . . Enumerate all the rights of men! I am sure, sir, that no gentleman in the late Convention would have attempted such a thing.

Barnett, *supra* n.67, at 27 (quoting The Debates in the Convention of the State of Pennsylvania on the Adoption of the Federal Constitution (Dec. 4, 1781), in 2 THE
(continued…)

government possessed the power to infringe others not so enumerated.[69]  After all, the belief in the existence of fundamental rights as a matter of natural law independent of any governing charter was a fixture of the American polity from its founding moment, celebrated by the Declaration of Independence's stirring recognition of the "self-evident" truth that "all men are created equal, that they are endowed by their Creator with certain unalienable Rights."

James Madison—the principal drafter of the Constitution—proposed a solution to the stalemate.  The Ninth Amendment unambiguously rejects the notion that the Bill of Rights represents the beginning and the end of fundamental rights.  It simply makes clear that the first eight Amendments are not an exclusive list.  They were just the rights, in Madison's words, that were "singled out."[70]

---

DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 415, 454 (Jonathan Elliot ed., 2d ed. 1907)).

[69]    THE FEDERALIST No. 84, at 513 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("I go further and affirm that bills of rights, in the sense and to the extent in which they are contended for, are not only unnecessary in the proposed Constitution but would even be dangerous.  They would contain various exceptions to powers which are not granted; and, on this very account, would afford a colorable pretext to claim more than were granted.  For why declare that things shall not be done which there is no power to do?").

[70]    In his statement to Congress introducing the proposed amendments that would become the Bill of Rights, James Madison explained:

It has been objected also against a bill of rights, that, by enumerating particular exceptions to the grant of power, it would disparage those rights which were not placed in that enumeration, and it might follow by implication, that those rights which were not singled out, were intended to be assigned into the hands of the general government, and were consequently insecure.  This is one of the most plausible arguments I have ever heard urged against the admission of a bill of rights into this system; but, I conceive, that may be guarded against.

1 Annals of Cong. 456 (Statement of James Madison), Library of Congress, A Century of Lawmaking for a New Nation: U.S. Congressional Documents and Debates, 1774–1875, *available                        at*                        https://memory.loc.gov/cgi-
(continued…)

Since its ratification, the Ninth Amendment has played effectively no role in constitutional adjudication. This state of affairs is to the liking of some. Judge Robert Bork, during the United States Senate hearings on his nomination to the Supreme Court, famously described the Ninth Amendment as an "ink blot," and suggested that it is inappropriate for a court to consider what lies underneath.[71] But given the words of that Amendment, its purpose, and its original meaning, unenumerated rights must exist. The Constitution says that they do. The founding generation took the step of amending the Constitution expressly to make clear that those rights exist.

The closest that the Ninth Amendment ever came to a moment in the judicial spotlight was not in a majority opinion, but rather in Justice Arthur Goldberg's concurrence in *Griswold*.[72] Whereas the Court's majority chose to discover the right to marital privacy in "penumbras, formed by emanations" of various provisions of the Bill of Rights,[73] Justice Goldberg would have grounded that right on the Ninth Amendment. Believing the right of marital privacy to be indisputably fundamental, Justice Goldberg opined that failing to recognize it merely because it is not enumerated in the Bill of Rights would be to "ignore the Ninth Amendment and to give it no effect whatsoever."[74] Justice Goldberg did not

bin/ampage?collId=llac&fileName=001/llac001.db&recNum=229 (last visited June 1, 2023).

[71]    "I do not think you can use the Ninth Amendment unless you know something of what it means. For example, if you had an amendment that says 'Congress shall make no' and then there is an ink blot and you cannot read the rest of it and that is the only copy you have, I do not think the court can make up what might be under the ink blot . . . ." Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States: Hearings Before the S. Comm. on the Judiciary, 100th Cong. 249 (1989) (statement of Robert H. Bork) (quoted in Barnett, *supra* n.67, at 10).

[72]    *Griswold*, 381 U.S. at 486-99 (Goldberg, J., concurring). Chief Justice Earl Warren and Justice William Brennan joined Justice Goldberg's concurrence in *Griswold*.

[73]    *Id.* at 484.

[74]    *Id.* at 491.

see the invocation of the Ninth Amendment as an impermissible "broadening" of the powers of the judiciary; "rather it serves to support what this Court has been doing in protecting fundamental rights."[75]

Justice Goldberg's approach is consistent with the words and the history of the Ninth Amendment. And it is there, rather than the Due Process Clause, that courts could tether unenumerated rights. Of course, as the original Bill of Rights did not apply to the states, it is arguable whether rights recognized under the Ninth Amendment would apply to the states automatically, or whether they would need to be incorporated via the Fourteenth Amendment. The latter is a job well suited to the Privileges or Immunities Clause.

### C. The Privileges or Immunities Clause

Whereas the Ninth Amendment jurisprudence is a virtual *tabula rasa*, the Privileges or Immunities Clause precedent is more closely akin to a sawed-off tree branch.

Just as the original Constitution arose from the ashes of the War of Independence, the Fourteenth Amendment followed from the clash of arms—and ideas—that tore the nation apart in the Civil War. Slavery itself was incompatible with civil liberty, but even after its abolition, widespread violations of fundamental rights persisted throughout the southern states, as those states deprived both former slaves and their political allies of myriad freedoms that, if infringed by the federal government, would violate the guarantees of the Bill of Rights. The states, however, were free to take these unjust actions, because the Bill of Rights did not protect individuals from their own states.[76]

---

[75]     *Id.* at 493.

[76]     See *Barron v. City of Baltimore*, 32 U.S. 243, 247-48 (1833).

The Fourteenth Amendment was revolutionary in this regard. Its second sentence has served as the fountainhead of a great deal of modern jurisprudence, for it contains the Due Process Clause discussed throughout this opinion, as well as the Equal Protection Clause. But those provisions are preceded by another clause—one that was intended to do a great deal of the Fourteenth Amendment's work:

> *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States*; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.[77]

On its face, the Privileges or Immunities Clause appears to be rather significant, especially coupled with the understanding that "privileges" and "immunities" were merely synonyms for "rights."[78] However, shortly after the Fourteenth Amendment's ratification, in the *Slaughter-House Cases*,[79] the Supreme Court rendered the Clause an essentially dead letter. The Court opined that the widely held view of the Fourteenth Amendment as conferring federal protection of fundamental rights against state infringement was simply too radical a notion to have been intended, as it would change "the whole theory of the relations of the State and Federal governments to each other and of both these governments to the people."[80] The Court drew a sharp line between the rights of federal

---

[77]  U.S. CONST. amend. XIV, § 1 (emphasis added). For a recent, comprehensive historical analysis of these provisions, including the Privileges or Immunities Clause, *see* RANDY E. BARNETT & EVAN D. BERNICK, THE ORIGINAL MEANING OF THE FOURTEENTH AMENDMENT: ITS LETTER AND SPIRIT (The Belknap Press of Harvard Univ. Press 2021).

[78]  *See McDonald*, 561 U.S. at 813 (Thomas, J., concurring in part) ("At the time of Reconstruction, the terms 'privileges' and 'immunities' had an established meaning as synonyms for 'rights.' The two words, standing alone or paired together, were used interchangeably with the words 'rights,' 'liberties,' and 'freedoms,' and had been since the time of Blackstone.").

[79]  83 U.S. 36 (1872).

[80]  *Id.* at 78.

citizenship protected by the Privileges or Immunities Clause and those of *state* citizenship, which the Court viewed as much broader. The referenced federal rights were only those "which owe their existence to the Federal government, its National character, its Constitution, or its laws."[81] As the *McDonald* Court opined nearly a century and a half later, this meant that "other fundamental rights—rights that predated the creation of the Federal Government and that 'the State governments were created to establish and secure'—were not protected by the Clause."[82]

In dissent, Justice Field predicted that the *Slaughter-House* Court had rendered the Fourteenth Amendment "a vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage."[83] His prophecy would come to fruition a few years later. In *United States v. Cruikshank*, the Court snuffed out whatever remained of the Privileges or Immunities Clause, building upon *Slaughter-House* to conclude that the First and Second Amendments did not restrict the states because they protected natural rights that *pre-dated* the Constitution, and thus were not "in any manner dependent upon that instrument" for their existence.[84] Following

---

[81]     *Id.* at 79.

[82]     *McDonald*, 561 U.S. at 754 (quoting *Slaughter-House*, 83 U.S. at 76). Although the *Slaughter-House* Court suggested that the Privileges or Immunities Clause may protect some enumerated constitutional rights such as the "right to peaceably assemble" and the "privilege of the writ of *habeas corpus*," its focus upon less weighty items—such as access to "seaports," "navigable waters," and "subtreasuries," and the protection of the federal government "when on the high seas"—indicated that the provision's breadth was much narrower than a contemporary observer likely expected. *Slaughter-House*, 83 U.S. at 79.

[83]     *Slaughter-House*, 83 U.S. at 96 (Field, J., dissenting).

[84]     92 U.S. 542, 553 (1876). Although never expressly overruled, the rationale of *Cruikshank* was incompatible with later "incorporation" decisions, specifically *De Jonge v. Oregon*, 299 U.S. 353 (1937), which held that the First Amendment's right to peaceable assembly is applicable to the states. *Cruikshank* was later rendered wholly obsolete by *McDonald*'s incorporation of the Second Amendment. *McDonald*, 561 U.S. at 791.

*Slaughter-House* and *Cruikshank*, the Privileges or Immunities Clause was moribund, and the nation was left in essentially the same situation as before the Fourteenth Amendment, with the guarantees of the Bill of Rights inapplicable to the states.

*Slaughter-House* and its progeny commonly are regarded as grievous errors and gross misapplications of the Fourteenth Amendment. Professor Amar has written of *Slaughter-House*: "Virtually no serious modern scholar—left, right, and center—thinks that this is a plausible reading of the Amendment."[85] Notwithstanding this broad consensus, the Court has never corrected its error. Instead, as noted above, the Court gradually applied the protections of the Bill of Rights—and other fundamental rights—to the states through the Due Process Clause. The Court even rejected an express and thoroughly developed request to correct the *Slaughter-House* error as recently as *McDonald* in 2010, instead adhering to established precedent to declare the Second Amendment applicable to the states via the Due Process Clause.

In recent decades, Justice Clarence Thomas has developed a compelling historical argument for a broader reading of the Privileges or Immunities Clause, noting that *Slaughter-House* "sapped the Clause of any meaning," and opining that the case was a cause of much "disarray" in Fourteenth Amendment jurisprudence.[86] Concurring in *McDonald*, Justice Thomas conducted a detailed analysis of the historical background and original meaning of the Privileges or Immunities Clause, concluding that the

---

[85] Amar, *supra* n.22, at 631 n.178. The extent of this scholarly consensus is illustrated by the *amicus curiae* brief submitted to the Court in *McDonald* by renowned constitutional law professors Richard L. Aynes, Jack M. Balkin, Randy E. Barnett, Steven G. Calabresi, Michael Kent Curtis, Michael A. Lawrence, William Van Alstyne, and Adam Winkler. *See* Brief of Constitutional Law Professors as *Amici Curiae* in Support of Petitioners (hereinafter, "Professors' Brief"), at 33 n.16, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010) (No. 08-1521) (as it concerns the error of *Slaughter-House*, the "consensus of preeminent constitutional scholars and authoritative historians of otherwise disparate viewpoints is truly remarkable").

[86] *Saenz v. Roe*, 526 U.S. 489, 527 (1999) (Thomas, J., dissenting).

"evidence overwhelmingly demonstrates that the privileges and immunities of such citizens included individual rights enumerated in the Constitution," and that "the Clause establishes a minimum baseline of federal rights."[87]

The history is indeed compelling, and the *McDonald* majority made no effort to refute it. Indeed, a historical understanding of the Privileges or Immunities Clause further supports the view that the Clause also protects *unenumerated* rights. Although Justice Thomas himself is critical of the Court's fundamental rights jurisprudence and has suggested that he does not favor the same approach to privileges or immunities,[88] he has never disputed that the Privileges or Immunities Clause was intended to protect rights beyond those expressly listed in the Constitution.[89]

Scholarly debate about the intended scope of the Privileges or Immunities Clause focuses upon myriad events of the era, but perhaps no source has been so thoroughly mined as the series of congressional debates over the Fourteenth Amendment. These

---

[87] *McDonald*, 561 U.S. at 823, 850 (Thomas, J., concurring in part); *see id.* at 813-50 (discussing the history and meaning of the Privileges or Immunities Clause).

[88] *See Saenz*, 526 U.S. at 528 (Thomas, J., dissenting) ("We should also consider whether the Clause should displace, rather than augment, portions of our equal protection and substantive due process jurisprudence. The majority's failure to consider these important questions raises the specter that the Privileges or Immunities Clause will become yet another convenient tool for inventing new rights, limited solely by the 'predilections of those who happen at the time to be Members of this Court.'") (quoting *Moore v. East Cleveland*, 431 U.S. 494, 502 (1977)).

[89] *See McDonald*, 561 U.S. at 854 (Thomas, J., concurring in part) ("Because this case does not involve an unenumerated right, it is not necessary to resolve the question whether the Clause protects such rights."); *id.* at 854-55 (assuming the Privileges or Immunities Clause protects unenumerated rights, the "mere fact that the Clause does not expressly list the rights it protects does not render it incapable of principled judicial application . . . . To be sure, interpreting the Privileges or Immunities Clause may produce hard questions. But they will have the advantage of being questions the Constitution asks us to answer."); *Dobbs*, 142 S.Ct. at 2302 (Thomas, J., concurring) (stating that the "myriad rights that our substantive due process cases have generated" could be analyzed under the Privileges or Immunities Clause).

debates were extensively covered in the press at the time—particularly statements made by U.S. Representative John Bingham, the Amendment's principal author, and U.S. Senator Jacob Howard, its floor sponsor in the upper chamber.[90] The congressional record is not dispositive in itself, and scholars have found support for different views within it. But concerning unenumerated rights, it is important to note the degree to which debate referenced and incorporated the 1823 decision of *Corfield v. Coryell*,[91] in which Justice Bushrod Washington, riding circuit on the federal bench here in Pennsylvania, expounded upon the Privileges *and* Immunities Clause of Article IV of the Constitution, which concerns the rights of state citizenship.[92] In a passage repeatedly cited during congressional debates, Justice Washington in *Corfield* stated:

> The inquiry is, what are the privileges and immunities of citizens in the several states? We feel no hesitation in confining these expressions to those privileges and immunities which are, in their nature, *fundamental*; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign. What these fundamental principles are, it would perhaps be more tedious than difficult to enumerate. They may, however, be all comprehended under the following general heads: Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole.[93]

---

[90] *See McDonald*, 561 U.S. at 828-35 (Thomas, J., concurring in part); Professors' Brief, *supra* n.85, at 14-21.

[91] 6 F. Cas. 546 (C.C.E.D. Pa. 1823); *see McDonald*, 561 U.S. at 819-20; 832-35 (Thomas, J., concurring) (discussing *Corfield* and references to it in congressional debates); Professors' Brief, *supra* n.85, at 10-11, 15-16 (same).

[92] *See* U.S. CONST. art. IV, § 2; *supra* n.9

[93] *Corfield*, 6 F. Cas. 546, 551-52 (emphasis added).

Justice Washington described the privileges and immunities of state citizenship capaciously, invoking unenumerated rights in language echoing the Declaration of Independence.

In the Senate debates over the Fourteenth Amendment, Senator Howard described the Privileges *or* Immunities Clause of the Fourteenth Amendment as protecting two categories of rights: the "the personal rights guarantied [*sic*] and secured by the first eight amendments of the Constitution," and "the privileges and immunities spoken of" in *Corfield*.[94]  Of those latter rights, Senator Howard echoed Justice Washington's expansive language, stating that the privileges and immunities referenced "are not and cannot be fully defined in their entire extent and precise nature."[95]  Senator Howard's speech was widely disseminated in newspapers of the day, and presumably influenced ordinary people's understanding of the proposed amendment.[96]

In Justice Washington's and Senator Howard's language, one finds the same idea that gave rise to the Ninth Amendment—that the Constitution encompasses protection of fundamental rights beyond those specified; it would be impossible to list them all. Although I set forth here only the small fraction of the extensive historical record that I find most compelling in the context of unenumerated rights, and although the import of much of the history is debated, it is from this and similar evidence that many scholars conclude that the Privileges or Immunities Clause is not only the "textual basis for protection of the

---

[94]    Cong. Globe, 39th Cong., 1st Sess. 2765; *see McDonald*, 561 U.S. at 832 (Thomas, J., concurring in part).

[95]    Cong. Globe, 39th Cong., 1st Sess. 2765; *see* Professors' Brief, *supra* n.85, at 16.

[96]    *McDonald*, 561 U.S. at 832-33 (Thomas, J., concurring in part).

liberties in the Bill of Rights," but also serves as "the natural textual home for . . . unenumerated fundamental rights."[97]

Should the Supreme Court ever be willing to correct its historic *Slaughter-House* error, the Privileges or Immunities Clause warrants resuscitation. Whether on its own or in conjunction with the Ninth Amendment,[98] that Clause provides a more historically sound and practically superior basis for recognizing unenumerated rights—and protecting them against state infringement—than the Due Process Clause.

**D. Unenumerated Rights Adjudication**

The Supreme Court's use of the Due Process Clause as the fount of unenumerated rights jurisprudence has left both the Ninth Amendment and the Privileges or Immunities Clause adrift in the constitutional wilderness, in disregard of a command dating back to *Marbury v. Madison*: "It cannot be presumed that any clause in the constitution is intended to be without effect."[99] Undoubtedly, reorientation of unenumerated rights to a more textually sound foundation in these provisions would not solve all problems. Disputes would remain over the proper standard to apply, and over what particular rights should be recognized. A more cogent constitutional analysis would not magically align everyone's legal, moral, and political convictions. But it would remove

---

[97]    Professors' Brief, *supra* n.85, at 9 (quoting Michael J. Gerhardt, *The Ripple Effects of* Slaughter-House*: A Critique of the Negative Rights View of the Constitution*, 43 VAND. L. REV. 409, 449 (1990)).

[98]    *See* Adam Lamparello, *Fundamental Unenumerated Rights Under the Ninth Amendment and the Privileges or Immunities Clause*, 49 AKRON L. REV. 179, 191 (2016) ("The Ninth Amendment's language means what it says: fundamental rights exist independently of the Constitution's text, and citizens are entitled to full enjoyment of those rights. These fundamental rights *are* the Fourteenth Amendment's Privileges or Immunities.") (emphasis in original).

[99]    *Marbury v. Madison*, 5 U.S. 137, 174 (1803).

the most obvious and recurring objections to employment of the doctrine of "substantive due process," which rests upon perpetually shaky ground.[100]

The Constitution always has embraced the idea that fundamental rights exist beyond those specifically enumerated in the text. Any refusal to acknowledge such fundamental rights would be inconsistent with the Constitution's letter and meaning, both at the time of the adoption of the Ninth Amendment in 1791, and at the time of the ratification of the Fourteenth Amendment in 1868. Although I do not here presume to identify the definitive standard for identifying such rights, the sorts of analyses that the Supreme Court long has conducted to assess the "fundamental" status of a right appear well-suited to such an inquiry. There is no reason that such rights cannot be recognized on the more stable grounds of the Ninth Amendment and the Privileges or Immunities Clause, rather than under the dubious "substantive due process" rubric.

**II.**

Protection from any particular amount of punitive damages has never been recognized as a fundamental right. With the foregoing understanding of the underlying law, I turn to the Supreme Court's decisions that bring us here today. The Majority does an excellent job of summarizing the principles of law that now govern punitive damages, which emanate principally from *Pacific Mutual Life Insurance Company v. Haslip*,[101] *TXO*

---

[100]  *See* Tribe, *supra* n.10, at 193-94 ("Indeed, perennial dissatisfaction with the whole concept of substantive due process, both linguistically and historically, in themselves support the use of the Privileges or Immunities Clause as a less troublesome vehicle both for selective incorporation and for the elaboration of whatever unenumerated rights merit protection against the states.") (footnotes omitted); Mark C. Niles, *Ninth Amendment Adjudication: An Alternative to Substantive Due Process Analysis of Personal Autonomy Rights*, 48 UCLA L. REV. 85, 135 (2000) ("Substantive due process is a weak and flawed doctrine, and the Ninth Amendment mechanism discussed above—which avoids at least some of the weaknesses and flaws of substantive due process—would significantly improve our personal autonomy jurisprudence.").

[101]  499 U.S. 1 (1991).

*Production Corp. v. Alliance Resources Corp.*,[102] *BMW of North America, Inc. v. Gore*,[103] and *State Farm Mutual Automobile Insurance Company v. Campbell.*[104]  I commend the Majority for its effort—because an effort it is—to apply this welter of precedent on its own terms, as we are bound to do in this matter of federal constitutional law.  But it is the Supreme Court's handiwork that has led me to this lengthy discussion, and there are features of that Court's punitive damages decisions that illustrate why I find that work untenable.  The more time that I spend with *Haslip* and *TXO*, *Gore* and *State Farm*, the more problematic that I find their rationales, and the more it seems that the best course would be to pull the whole line of cases, root and branch, from the exhausted soil of substantive due process.[105]

Broadly, there are two overarching problems with these decisions, one doctrinal and one practical.  Each area of analysis induces headaches.

**A.**

It is important that we be clear about what we are discussing, even if the precedent that we analyze is not.  The fact that I am skeptical of a due process right to a particular threshold on the *amount* of punitive damages does not mean that I believe due process plays no role in the matter.  Certainly, as in any trial or legal proceeding, there are procedural interests requiring procedural protections as such.  Deprivations of due process may lurk here just as they do elsewhere in the law.  But generally, I would suggest

---

[102]  509 U.S. 443 (1993).

[103]  517 U.S. 559 (1996).

[104]  538 U.S. 408 (2003).

[105]  To be sure, the Supreme Court has no reason whatsoever to notice, much less heed, my thoughts on the matter, and I am well aware that the Supreme Court has both the first and the last word on the question.

that a civil defendant's federal due process rights are protected by, for instance, adherence to state law procedures, a fair trial, and a properly instructed jury.[106]

Judicial tinkering with the amount of a jury's award, an award bestowed upon an injured party after full consideration of the facts and following an undisputedly fair trial, is something different—something substantive. Although such a power to reduce jury verdicts is a venerable feature of the common law and has long inhered in state court judges in Pennsylvania and elsewhere,[107] the federal "constitutionalization" of this power is an intrusion that looks little like the application of "due process of law." Or perhaps more accurately, it looks like an application of the Due Process Clause from the *Lochner* era.

State law is the proper frame of reference, as it was before the Court's 1991 decision in *Haslip*. Prior to that decision, limitation of punitive damage awards was solely a matter of state statutory and common law. Rumblings about allegedly exorbitant punitive damage awards always have had the ability to generate outrage, and by the 1980s and 1990s, objections to the sheer size of some awards had reached the United States Supreme Court, which overtly noted its "concern about punitive damages that 'run wild.'"[108] In 1989, the Court rejected an effort to interpret the Eighth Amendment's Excessive Fines Clause[109] as a limitation on punitive damage awards (where one might

---

[106] *See Haslip*, 499 U.S. at 40 (Kennedy, J., concurring) ("Elements of whim and caprice do not predominate when the jury reaches a consensus based upon arguments of counsel, the presentation of evidence, and instructions from the trial judge, subject to review by the trial and appellate courts.").

[107] *See* Maj. Op. at 24-25 (discussing the pre-*Haslip* law of Pennsylvania).

[108] *Haslip*, 499 U.S. at 18.

[109] U.S. CONST. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

expect such a limitation to reside, if anywhere), but the Court left open the notion that the Due Process Clause might do the work, and even invited such a challenge.[110]

The Court answered that call in *Haslip*. Many of the Court's explanations for the deceptively significant step that it was taking in fact sound like reasons *not* to take it. The Court first recognized that punitive damages "have long been a part of traditional state tort law,"[111] and that the Court had long approved of the states' traditional common-law approach to such damages' imposition and limitation.[112] The Court quoted numerous precedents that approved of the common-law approach, and it exalted the discretion of juries to award damages. The Court even noted that, "[s]o far as we have been able to determine, every state and federal court that has considered the question has ruled that the common-law method for assessing punitive damages does not in itself violate due process."[113] Continuing to raise questions as to why, therefore, it had any business in this matter, the Court went so far as to highlight that "the common-law method for assessing punitive damages was well established before the Fourteenth Amendment was

---

[110] *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276-77 (1989); *see id.* at 280 (Brennan, J., concurring) ("I join the Court's opinion on the understanding that it leaves the door open for a holding that the Due Process Clause constrains the imposition of punitive damages in civil cases brought by private parties."); *id.* at 282-83 (O'Connor, J., concurring in part) ("Awards of punitive damages are skyrocketing . . . . [N]othing in the Court's opinion forecloses a due process challenge to awards of punitive damages or the method by which they are imposed.").

[111] *Haslip*, 499 U.S. at 15 (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984)).

[112] Under the traditional common-law approach, the Court explained, "the amount of the punitive award is initially determined by a jury instructed to consider the gravity of the wrong and the need to deter similar wrongful conduct," and the "jury's determination is then reviewed by trial and appellate courts to ensure that it is reasonable." *Id.*

[113] *Id.* at 17.

enacted. Nothing in that Amendment's text or history indicates an intention on the part of its drafters to overturn the prevailing method."[114]

Notwithstanding its candid acknowledgment that the Due Process Clause of the Fourteenth Amendment in no way suggests any limitation upon the state common law of punitive damages, the Court elected to manufacture such a limitation. But it had remarkably little to say about it. It gave one rhetorical justification, noting that just because the practice of imposing punitive damages is deeply rooted in state law does not mean that it can *never* be unconstitutional. But, as for those of us who might be skeptical of the use of the Due Process Clause to place a substantive limit on the *amount* of punitive damage awards, we are simply told that we must "concede": "One must concede that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that *jar one's constitutional sensibilities*."[115]

In what would become a mantra in future cases, the Court left deliberately fuzzy the line at which one's "sensibilities" should be offended: "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."[116] Instead, the Court stated that "general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus."[117] With those principles established, the Court turned to the punitive damage award before it, which it stressed was more than four times the amount of the compensatory damages awarded (a later-significant 4:1 ratio), and exceeded the criminal fines that could have been

---

[114]    *Id.* at 17-18.

[115]    *Id.* at 18 (emphasis added).

[116]    *Id.*

[117]    *Id.*

imposed under state law for similar conduct (though surely not the potential imprisonment). Although this may have been "close to the line," the award was permissible because it "did not lack objective criteria," and thus did not "cross the line into the area of constitutional impropriety."[118] In upholding the award in this manner, the Court obscured the significance of what had just happened.

The consequence of the *Haslip* Court's reasoning was not lost on Justice Scalia. In his *Haslip* concurrence, Justice Scalia laid out the case that punitive damage awards are not a federal constitutional concern. He gave a thorough history of both punitive damages and the principles of due process, demonstrating that "it has been the traditional practice of American courts to leave punitive damages (where the evidence satisfies the legal requirements for imposing them) to the discretion of the jury," and that, "when the Fourteenth Amendment was adopted, punitive damages were undoubtedly an established part of the American common law of torts."[119] Justice Scalia contended that this observation was effectively dispositive of questions of due process relating to punitive damages, and that he would "end the suspense and categorically affirm their validity."[120]

Justice Kennedy, at the time, likewise rejected an expansive reading of due process requirements into the state law of punitive damages, commenting that the jury's assessment of punitive damages "has such long and principled recognition as a central part of our system that no further evidence of its essential fairness or rationality ought to be deemed necessary."[121] But Justice Kennedy left open the possibility that the size of some awards may raise due process concerns, inasmuch as "the extreme amount of an

---

[118]    *Id.* at 23-24.

[119]    *Id.* at 24-26 (Scalia, J., concurring).

[120]    *Id.* at 39-40.

[121]    *Id.* at 40 (Kennedy, J., concurring)

award compared to the actual damage inflicted can be some evidence of bias or prejudice" on the part of the jury.[122]  He referenced the potential need for change at the state level, because federal judges—so we thought—"do  not have the authority, as do judges in some of the States, to alter the rules of the common law respecting the proper standard for awarding punitive damages and the respective roles of the jury and the court in making that determination."[123]

To Justice O'Connor, punitive damages were a "weapon" with "devastating potential for harm."[124]  Justice O'Connor lauded the application of the Due Process Clause, but unlike the *Haslip* majority, she would have invalidated the punitive damage award at bar.  Beyond championing the Court's novel use of due process in this area, perhaps Justice O'Connor's greatest contribution to the precedents to come would be her invocation of the void-for-vagueness concept in this context, a thread of due process doctrine, discussed above, which insists that laws—criminal laws, ordinarily—fairly place people on notice of prohibited conduct.[125]  In support of this novel application of the doctrine, Justice O'Connor stated that the "void-for-vagueness doctrine applies not only to laws that proscribe conduct, but also to laws that vest standardless discretion in the jury to fix a penalty."[126]  And after discussing the procedures that attended the Alabama jury's verdict, which she found deeply inadequate, Justice O'Connor declared that the

---

[122]     *Id.* at 41.

[123]     *Id.* at 42.

[124]     *Id.* at 42 (O'Connor, J., dissenting).

[125]     *See supra* nn.46-47 and accompanying text.

[126]     *Haslip*, 499 U.S. at 44 (O'Connor, J, dissenting) (citing *United States v. Batchelder*, 442 U.S. 114, 123 (1979)).

"vagueness question is not even close."[127]  Separately, she would have concluded that the award violated procedural due process as well.[128]

*Haslip* is the original error that begat the ones that followed.  With little to explain why due process was implicated, or how it could be violated, the Court had nonetheless drawn a line.  Where that line lay could not be known.  The constitutional principle appeared to be a matter of avoiding "extremes" that "jar one's constitutional sensibilities," a phrase reminiscent of the "shocking the conscience" language that has appeared in some *substantive* due process cases,[129] and which resembled the state common-law standards that the Court now determined it could improve upon.[130]  Beyond that, a due process inquiry into a punitive damage award, *Haslip* says, should focus upon "general concerns of reasonableness"—a *substantive* consideration—and "adequate guidance from the court when the case is tried to a jury"—a matter of *procedure*.

In the cases that followed, the Court would blend due process concepts indiscriminately, combining bits of one doctrine with pieces of others.  In *TXO*, a plurality of the Court stated, "[a]ssuming that fair *procedures* were followed, a judgment that is a product of that process is entitled to a strong presumption of validity."[131]  Here, the Court

---

127     *Id.* at 46.

128     *Id.* at 53-60.

129     *See, e.g.*, *Rochin v. California*, 342 U.S. 165, 172 (1952); *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience' . . . .") (citing *Rochin*).

130     *See, e.g.*, *Kirkbride v. Lisbon Contractors, Inc.*, 555 A.2d 800, 803-04 (Pa. 1989) (articulating the pre-*Haslip* law of Pennsylvania) ("[A]t some point the amount of punitive damages may be so disproportionate when compared to the character of the act, the nature and extent of the harm and the wealth of the defendant, that it will shock the court's sense of justice.  In those rare instances, the court is given discretion to remit the damages to a more reasonable amount.") (emphasis added).

131     *TXO*, 509 U.S. at 457 (plurality) (emphasis added).

showed deference to the *amount* of an award based upon procedural due process considerations. But the *TXO* plurality was more interested than the *Haslip* Court in explicating the origin of the Court's claimed authority to control the amount of a jury verdict, and what it found were a number of early twentieth century substantive due process decisions that invalidated penalties which were deemed "arbitrary and oppressive," or "grossly excessive."[132] Consideration of an award's "excessiveness" is certainly a question of *substance*.

Shaking off the criticism of the respondents, who "unabashedly denigrate[d] those cases as *Lochner*-era precedents," the *TXO* plurality countered that Justices who dissented in *Lochner* joined the cited decisions, and that the respondents did not dispute that the Fourteenth Amendment "imposes a substantive limit on the amount of a punitive damages award."[133] Proceeding as if that settled the matter, the Court ever after would use the terms "grossly excessive" and "arbitrary" to describe the nature of the punitive damage awards that the Due Process Clause ostensibly precludes.[134] The Court also has collapsed these descriptions, noting in *State Farm* that, "[t]o the extent an award is *grossly excessive*, it furthers no legitimate purpose and constitutes an *arbitrary* deprivation of property."[135] Whether "arbitrariness" was intended as a substantive

---

[132] *Id.* at 454 (citing, *inter alia*, *Seaboard Air Line R. Co. v. Seegers*, 207 U.S. 73, 78 (1907); *Southwestern Telegraph & Telephone Co. v. Danaher*, 238 U.S. 482, 491 (1915); *Waters–Pierce Oil Co. v. Texas (No. 1)*, 212 U.S. 86, 111 (1909)).

[133] *TXO*, 509 U.S. at 455 (plurality) (internal quotation marks omitted).

[134] *Gore*, 517 U.S. at 562 ("The Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a 'grossly excessive' punishment on a tortfeasor.") (citing *TXO*, 509 U.S. at 454, "(and cases cited)"). "And cases cited" does a great deal of work in *Gore*'s citation. *See also State Farm*, 538 U.S. at 416 ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor.") (citing, *inter alia*, *Gore*).

[135] *State Farm*, 538 U.S. at 417 (citing *Haslip*, 499 U.S. at 42 (O'Connor, J., dissenting)) (emphasis added).

consideration or a procedural one, here it merged with the Court's primary emphasis upon the substantive consideration of "excessiveness."

*Gore*, the first of these decisions to actually take the step of invalidating a punitive damages award as a violation of due process, omitted any reference to a presumption of validity based upon "fair procedures," and that consideration did not reappear in *State Farm*. *Gore* likewise was the first to expressly constitutionalize an inquiry referenced in *Haslip* and *TXO*, which would take center stage in *State Farm*—assessing the amount of punitive damages as a "ratio" compared to compensatory damages. In the Court's words, punitive damages must bear a "reasonable relationship" to compensatory damages.[136]

But *Gore* also added an entirely new flavor of due process to the mix: "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."[137] Here the Court introduced another *procedural* concept—"fair notice." Further, although not stated explicitly, this new addition to the punitive damages lexicon was a near word-for-word incorporation of common formulations of the void-for-vagueness doctrine, an entirely distinct strand of due process jurisprudence.[138] While this recalled Justice O'Connor's proposal in her *Haslip* dissent, she had focused not upon giving "fair notice" to a civil litigant of proscribed conduct, but rather upon "laws that vest standardless discretion in the jury to fix a penalty."[139] *Gore*'s invocation of the void-for-vagueness doctrine focused not upon cabining the jurors, but

---

[136]    *Gore*, 517 U.S. at 581.

[137]    *Id.* at 574.

[138]    *Compare id.* (requiring that "a person receive fair notice . . . of the conduct that will subject him to punishment"), *with Johnson*, 576 U.S. at 595 (void-for-vagueness doctrine requires that law "give ordinary people fair notice of the conduct it punishes").

[139]    *Haslip*, 499 U.S. at 44 (O'Connor, J., dissenting).

upon providing warning to the tortfeasor. Adding to the confusion, *Gore* cited several cases for the "fair notice" proposition, most of which concerned *ex post facto* violations and retroactive application of laws.[140]

By the time of *State Farm*, the Court largely had stopped bothering to cite any decisions prior to *Haslip*. It was "well established," the Court declared, "that there are procedural and substantive constitutional limitations on these awards."[141] This was certainly true, but where the procedure ends and the substance begins is less than clear. From the very beginning of this line of cases, the Court's primary concern was a substantive objection to awards of "excessive" size, and the cases it originally cited for its view of due process undoubtedly are *Lochner*-era substantive due process decisions. But procedural language recurs nearly as prominently, as the Court stressed "fair notice," "fair procedures," and providing juries with "adequate guidance from the court." Drop hints of protection from "arbitrary" laws, and, while those are working their way in, toss in some "reasonable relationship" and "legitimate purpose" language, and then sprinkle in a dash of void-for-vagueness doctrine. An "eye of newt, and toe of frog, wool of bat, and tongue of dog," and the due process witches' brew is complete.[142]

Given the array of due process principles cobbled and mashed up together, this area of the law bears little resemblance to any of the recognizable, and currently recognized, strands of due process jurisprudence. What emerges is an approach that performs a nominal gesture toward "due process of law" while providing little analysis or detail, and in practice ends up focusing more upon what a majority of Supreme Court

---

[140]    *Gore*, 517 U.S. at 574 n.22.

[141]    *State Farm*, 538 U.S. at 416; *but see id.* at 431 (Ginsburg, J., dissenting) ("If our activity in this domain is now 'well established,' it takes place on ground not long held.") (citation omitted).

[142]    WILLIAM SHAKESPEARE, MACBETH act 4, sc. 1, l. 14-15.

Justices at the moment might "hunch" to be "too much."[143]  Unable as I am to situate the Court's reasoning within the law of due process, its enterprise looks more like an older sort of case.  Perhaps unsurprisingly given its precedential origins, the new law of punitive damages bears a resemblance to the "doctrine that prevailed in *Lochner . . .* that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely."[144]  Here, it is the wisdom of juries, long the repository of the moral conscience of the people, that lies exposed to questioning by a disapproving Court.

The Justices in the minority in these decisions, representing the full spectrum of judicial philosophies, recognized this problem alongside other significant deficiencies in the Court's approach.  Justice Kennedy, who hesitated to endorse the Court's reasoning in *Haslip*, but who would later join *Gore* and write for the Court in *State Farm*, noted in his *TXO* concurrence that the Court's approach to the "excessiveness" inquiry "comes close to relying upon nothing more than its own subjective reaction to a particular punitive damages award in deciding whether the award violates the Constitution."[145]  Justice Ginsburg referred to the Court's invalidation of the punitive damage award in *State Farm* as a "substitution of its judgment" for that of the state's "competent decisionmakers."[146]  Justice Scalia critiqued the Court's "new rule of constitutional law" as "constrained by no

---

[143]    As Judge Ruggero Aldisert wrote, quoting another federal appellate judge, "decisions may emerge from any of four separate processes:  'first, the cogitative, of and by reflection and logomachy; second, aleatory, of and by the dice; third, intuitive, of and by feeling or "hunching"; and fourth, asinine, of and by an ass.'"  RUGGERO J. ALDISERT, THE JUDICIAL PROCESS: TEXT, MATERIALS AND CASES 524 (2d ed. 1996) (quoting J.C. Hutcheson, Jr., *The Judgment Intuitive: The Function of the "Hunch" in Judicial Decision*, 14 CORNELL L. Q. 274, 275-76 (1929)).  (Note:  The Cornell Law Quarterly was renamed the Cornell Law Review in 1967.)

[144]    *Ferguson*, 372 U.S. at 730; *supra* n.32.

[145]    *TXO*, 509 U.S. at 466-67 (Kennedy, J., concurring).

[146]    *State Farm*, 538 U.S. at 422 (Ginsburg, J., dissenting).

principle other than the Justices' subjective assessment of the 'reasonableness' of the award in relation to the conduct for which it was assessed."[147]  The Court was unable to slip its *Lochner*-izing past Justice Scalia, who decried the Court's reliance upon "*Lochner*-era cases"[148] which had "invented the notion that an unfairly severe civil sanction amounts to a violation of constitutional liberties" and that "simply fabricated the 'substantive due process' right at issue."[149]

These Justices, particularly Justice Scalia and Justice Ginsburg, further and persuasively articulated their dismay concerning the Court's intrusion upon state law. From *Haslip* onward, Justice Scalia repeatedly objected that, notwithstanding certain Justices' fretting over the size of punitive damage awards, "the Constitution does not make that concern any of our business," and that "the Court's activities in this are an unjustified incursion into the province of state governments."[150]  "The Constitution provides no warrant for federalizing yet another aspect of our Nation's legal culture (no matter how much in need of correction it may be)."[151]  Justice Ginsburg believed that, by taking these steps, the Court "unnecessarily and unwisely venture[d] into territory traditionally within the States' domain,"[152] and that the "Court has no warrant to reform state law governing awards of punitive damages."[153]

---

[147]     *Gore*, 517 U.S. at 599 (Scalia, J., dissenting).

[148]     *TXO*, 509 U.S. at 470 (Scalia, J., concurring).

[149]     *Gore*, 517 U.S. at 600-01 (Scalia, J., dissenting).

[150]     *Id.* at 598; *see also TXO*, 509 U.S. at 472 (Scalia, J., concurring) ("As I said in *Haslip*, the Constitution gives federal courts no business in this area, except to assure that due process (*i.e.*, traditional procedure) has been observed.").

[151]     *Gore*, 517 U.S. at 599 (Scalia, J., dissenting).

[152]     *Id.* at 607 (Ginsburg, J., dissenting).

[153]     *State Farm*, 538 U.S. at 438 (Ginsburg, J., dissenting).

I agree with the Court's minority in these cases. As a matter of due process doctrine, *Haslip* and its progeny are unsupportable. As a matter of federalism, these decisions represent a needless disruption of the balance between federal constitutional law and state statutory and common law.

**B.**

Setting aside the doctrinal inadequacies of *Haslip* (and progeny), and taking the Court's reasoning on its own terms, the application of the standard that the Court has left for us still leaves much to be desired. As Justice Scalia commented in *Gore*, acidly but not inaccurately: "One might understand the Court's eagerness to enter this field, rather than leave it with the state legislatures, if it had something useful to say."[154] But as the Court attempted to make its analysis more concrete and judicially manageable, the folly of the endeavor became ever more apparent, indeed, unavoidable.

Although a fixture of the Court's decisions has been a refusal to draw any bright lines as to what is "too much," it has attempted to give its amorphous standards some shape. First were the three *Gore* "guideposts," itself a flexible word. As more concisely summarized in *State Farm*, these "guideposts" are: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."[155] Although these "guideposts" were likewise criticized as insufficiently definite,[156] they at least reflected some attempt to articulate a standard

---

[154]    *Gore*, 517 U.S. at 602 (Scalia, J., dissenting).

[155]    *State Farm*, 538 U.S. at 418 (citing *Gore*, 517 U.S. at 575).

[156]    *Gore*, 517 U.S. at 605 (Scalia, J., dissenting) ("The legal significance of these 'guideposts' is nowhere explored, but their necessary effect is to establish federal (continued…)

reminiscent of other multifactorial inquires or balancing tests, rather than merely invoking the Court's "constitutional sensibilities" and "general concerns of reasonableness" or the like.[157]

Then came *State Farm*. Still seeking to refine the applicable test, the *State Farm* Court ended up choosing perhaps the worst of all options—a murky concoction of ratios and multipliers that insists it is not a bright line, yet commonly is read as one. *State Farm* first sought to put some meat on the bones of the first *Gore* "guidepost"—the degree of reprehensibility—which it described as the "most important indicium of the reasonableness of a punitive damages award."[158] The Court distilled some considerations of "reprehensibility" considered in *Gore*,[159] and added that the "existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect."[160]

But if reprehensibility is the most important factor, it was upstaged by arithmetic. Ask some lawyers you know what the constitutional limit on punitive damages is, and you will likely hear tell of a "10:1 ratio rule" comparing the amount of punitive damages to the compensatory damages awarded. This impression is prevalent notwithstanding the Supreme Court's repeated insistence that it "need not," and indeed "cannot" draw "a

---

standards governing the hitherto exclusively state law of damages . . . . In truth, the 'guideposts' mark a road to nowhere; they provide no real guidance at all.").

[157]  *Haslip*, 499 U.S. at 18.

[158]  *State Farm*, 538 U.S. at 419 (quoting *Gore*, 517 U.S. at 575).

[159]  These "reprehensibility" considerations are whether: "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id.* (citing *Gore*, 517 U.S. at 576-77.

[160]  *Id.*

mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."[161]   *State Farm* reiterated this, as is tradition, noting that the Court has been "reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award."[162] The Court "decline[d] again to impose a bright-line ratio which a punitive damages award cannot exceed."[163]

But the Court came close, drawing not a "bright line," but perhaps a dim one.  "Our jurisprudence and the principles it has now established," the Court stated, demonstrate that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."[164]   As this sentence has become perhaps the most important in the new constitutional law of punitive damages, it is worth a close look.

At this juncture, it is important to remember what we are talking about.  The Court here engages in a mathematical exercise to assess the size of the punitive damages award by producing a "ratio," asking how many times larger the punitive award is than the compensatory award.  Too high of a ratio, the Court states, and the award may be "excessive," and thus unconstitutional as a deprivation of "due process."

A "single-digit" ratio between punitive and compensatory damages is the Court's preference—call it 9:1, or maybe 9.999:1.  Why "single-digit ratios" were selected as the line is unstated.  "*Few*" awards exceeding such a ratio will satisfy due process, which necessarily implies that *some* such awards are permissible.  Further, the ratio is

---

[161]   *Haslip*, 499 U.S. at 18; *see also TXO*, 509 U.S. at 458 (quoting *Haslip*); *Gore*, 517 U.S. at 582-83 (same).

[162]   *State Farm*, 538 U.S. at 424.

[163]   *Id.* at 425.

[164]   *Id.*

problematic when it exceeds single digits "*to a significant degree*," which necessarily implies that *some* upward deviation is permissible. 11:1? How about 25:1? The Court does not say. *State Farm* does say that *Haslip* considered 4:1 to be "close to the line of constitutional impropriety," and the Court cited that passage again in *Gore*.[165] 4:1 is close to the line, but 9:1 is the line, and awards should not exceed that line "to a significant degree," but a "few" that do are nonetheless permissible.

But "because there are no rigid benchmarks that a punitive damages award may not surpass," the Court says, these ratios may slide up and down depending upon the circumstances.[166] "Ratios greater than those we have previously upheld[167] may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"[168] On the other hand: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."[169]

This passage is remarkable, for several reasons. First, the Court provided no guidance as to what a "small amount" of economic damages means. Presumably, it is the opposite of "substantial." "Substantial" is a term that appears to be rather important to the analysis, but the Court gives us no hint of what a "substantial" compensatory damage award is. Is it a pure dollar amount? $10,000? $100,000? Or is an award "substantial" in relation to what the plaintiff seeks, or the amount awarded in similar

---

165    *State Farm*, 538 U.S. at 425.

166    *Id.*

167    The Court upheld a ratio of *526:1* in *TXO*. *See TXO*, 509 U.S. at 459 ("In support of its submission that this award is 'grossly excessive,' TXO places its primary emphasis on the fact that it is over 526 times as large as the actual damages award.").

168    *State Farm*, 538 U.S. at 425 (quoting *Gore*, 517 U.S. at 582).

169    *Id.*

cases? In this regard, it is important to remember that we are speaking of compensatory damages, which *compensate* the plaintiff for a loss. A plaintiff might say that his compensatory damage award was "substantial" because his *loss* was substantial. What bearing should that have upon his ability to recover punitive damages if the tortious conduct was reprehensible and the consequences grave?[170]

According to the *State Farm* Court, it has a significant bearing. If a compensatory damage award is "substantial," then punitive damages must fall within a "lesser ratio, *perhaps only equal to compensatory damages*."[171] That ratio, of course, would be 1:1. This is a remarkably restrictive suggestion. But it also calls into question everything the Court just said. Again, the general rule—the not-bright-line—was the "single-digit ratio," pronounced mere sentences earlier. Now, when an award is "substantial," the permissible line can shrink to as low as 1:1. But what of the entire range between 1:1 and 9:1? Are those single-digit ratios, which were purportedly within the generally comfortable constitutional range that the Court had just identified, only permissible when a compensatory award is *not* substantial? But if an award is not "substantial," and thus reflects a "small amount" of compensatory damages, the Court also stated that the ratio may be "greater than those we have previously upheld," so presumably well *above* the ordinary range of single-digit ratios. The general rule that the *State Farm* Court tried to articulate was, within a paragraph, rendered incomprehensible by the Court's standardless caveats and qualifications. To call this a standard is unduly charitable.

I find much greater persuasive power in what Justice Kennedy wrote prior to the *State Farm* mishmash: "The Constitution identifies no particular multiple of compensatory

---

[170] Indeed, the suggestion that large compensatory awards necessitate restricted punitive awards endorses a "volume discount" on tortious harm: The more compensable harm caused, the lower the comparable scale of permissible punishment.

[171] *Id.* (emphasis added).

damages as an acceptable limit for punitive awards; it does not concern itself with dollar amounts, ratios, or the quirks of juries in specific jurisdictions."[172]  "Due process of law" does not reduce to a question of numerators and denominators.  The specific contours of state policy limiting the amount of punitive damage awards are, and should be, matters of state statutory and common law, including the trial judge's historic power of remittitur. As Justice Ginsburg wrote: "In a legislative scheme or a state high court's design to cap punitive damages, the handiwork in setting single-digit and 1-to-1 benchmarks could hardly be questioned; in a judicial decree imposed on the States by this Court under the banner of substantive due process, the numerical controls today's decision installs seem to me boldly out of order."[173]

It is here that I perceive the sort of "freewheeling judicial policymaking"[174] that less resembles a constitutional analysis than an effort to rewrite state common law, *Erie*[175] be damned.  But the Due Process Clause is not, to borrow a phrase from the Court, a "font of tort law to be superimposed upon whatever systems may already be administered by the States."[176]  The "Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."[177]

---

[172]    *TXO*, 509 U.S. at 467 (Kennedy, J., concurring).

[173]    *State Farm*, 538 U.S. at 438 (Ginsburg, J., dissenting).

[174]    *Dobbs*, 142 S.Ct. at 2248.

[175]    *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts.  And no clause in the Constitution purports to confer such a power upon the federal courts.").

[176]    *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

[177]    *Daniels*, 474 U.S. at 332.

In its attempt to set general constitutional rules, the Court has in essence empowered itself to make policy choices governing state tort law, and not even necessarily good ones, inasmuch as they arguably undermine countervailing policy concerns serving the undisputedly valid interests in "punishing unlawful conduct and deterring its repetition."[178]  *State Farm*, for instance, disapproved of using the defendant's wealth as a consideration in setting punitive damages.[179]  This overlooks the rational economic proposition that the particularly wealthy are unlikely to be deterred by anything less than the possibility of a particularly large verdict.  And to the extent that the Court even attempted to draw something close to a "bright line" beyond which punitive damage awards may not cross, this endeavor invites a straightforward calculation: if a business can predict with reasonable confidence the amount of harm a tortious course of action may cause, multiply that number by the magic ratio, and determine that it stands to profit nonetheless, then the punitive damages fail to serve their function of deterrence.  A bit of unpredictability, and the prospect of an outraged jury, can go a long way in achieving deterrence.  Of course, states nonetheless may wish to cap punitive damages at some threshold as a matter of state law, as many have done, but this provides no warrant or authority for the Supreme Court to draw such lines through the federal Due Process Clause.

But of course, the Court has not actually set any bright line, and it is we, in state courts, who are called upon to determine precisely the line that "due process" will tolerate in concrete cases—precisely the line that the Supreme Court declined to draw.  The arguments presented in today's case suggesting "presumptive unconstitutionality"

---

[178]  *Gore*, 517 U.S. at 568.

[179]  *See State Farm*, 538 U.S. at 427 ("The wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award.").

beyond fixed limits demonstrate the folly of this endeavor, as they draw upon tantalizing language in *State Farm* suggestive of some such limit, but one so qualified and hedged as to be utterly unhelpful. Instead, this task of nailing Jell-O to a wall falls to us, as we parse imprecise and self-contradictory language in a quest to discern a particular dollar amount that the Justices of the Supreme Court might choose to find acceptable. The federal "constitutionalization" of punitive damages is not only a commandeering of state common law; it also impresses state court judges into federal service in an illusory and quixotic mission, the quintessential fool's errand.

**III.**

Can a punitive damage award, merely because of its size rather than any defect of procedure, deprive a civil defendant of due process of law? My understanding of the law of the due process, even its "substantive" formulations, leads me to conclude that the answer is "no."

Protection from the civil consequences of one's actions, following a fair trial, is not a "fundamental right." Imposition of a punitive damage award is not "arbitrary" or "irrational," but rather serves indisputably important interests in punishing reprehensible conduct and deterring similar such conduct in the future. The award is not the product of "vagueness" if the jury is properly instructed, if adequate state law procedures are followed, and if state law places all persons on notice that egregious torts may result in civil liability that includes punitive damages.

In my view, the *size* of a punitive damages award, by itself, is simply not a concern of the federal Due Process Clause.[180] If the Supreme Court believes that protection from some specific threshold of punitive damages is an unenumerated right guaranteed by the

---

[180] As noted, the award's size can be a *state* concern, under longstanding principles of common law. *See supra* n.130 (referencing the familiar "shock the court's sense of justice" standard).

United States Constitution, then it should abandon the erroneous precedent of *Haslip* and its progeny and ascertain, by whatever standard it deems appropriate, whether such a right emanates from the Ninth Amendment or the Privileges or Immunities Clause. Otherwise, it should leave state courts and legislatures to go about their business. That is the essence of federalism.

Bound as I am by the Supreme Court's pronouncements on this matter of federal constitutional law, I join the Majority Opinion.